## IN THE UNITED STATES STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICK CATONE, NICK CATONE MMA & FITNESS,<br>    Plaintiffs,<br><br>    v.<br><br>FACEBOOK, INC., MARK ZUCKERBERG,<br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO.:

## INTRODUCTION

1.     This is an action for money damages and injunctive relief against Facebook, a social media company and personal data harvester, and its founder and current chief executive officer, Mark Zuckerberg. The defendants seek to, and do, have quasi- monopolistic control of a quintessential public communications forum, offering users access to their service free of charge while surreptitiously selling data gathered from the users to third parties for a profit. The defendants enter into adhesion contracts with users, arrogating unto the defendants an opaque right to ban any user for violating the defendants' so-called "community standards." The Plaintiff has been denied the ability to speak publicly on a matter of grave public importance based on the perceived content of the ideas he sought to express. The Plaintiff claims a violation of his rights under the First Amendment to the United States Constitution, violations of the Communications Decency Act, statutory fraud, theft, a breach of the implied warranty of fair dealing, intentional interference with prospective economic advantage and malicious interference with prospective economic advantage.

## Jurisdiction

2.      The Court properly possesses jurisdiction on both federal question and diversity of citizenship grounds. Venue is appropriate because Defendants reside in New York and have an office in New York. The Claim arises under 42 Section 1983 and 47 U.S.C Section 230.

## Parties

3.      The Plaintiff, Nick Catone, is an adult resident of Brick, New Jersey.

4.      Facebook, Inc., is a social media company headquartered in Menlo Park, California. Facebook has several corporate offices in New York including at 770 Broadway, New York, New York 10003.  It operates a social media company serving more than 2.3 billion users worldwide.

5.      Mark Zuckerberg is the Chairman and Chief Executive Officer of Facebook, Inc., owning a controlling interest in the company's stock. He resides in Palo Alto, California.

## Facebook's Profitable Control of A Quintessential Public Forum

6.      As the United States Supreme Court noted in Packingham v. North Carolina, 137 U.S. 1735, 1735-36-(2017}, Facebook is part of the "vast democratic forum of the Internet." Packingham extended the concept of a quintessential public forum from parks and physical spaces to cyberspace.

7.      Facebook has a worldwide base of more than 2.3 billion users.

8.      More than 7 in 10 Americans have accounts on Facebook. They are not charged for their accounts.

9.      Facebook occupies a dominant, quasi-monopolistic position in the global public forum of the Internet, and is one of four American companies dominating Internet traffic together with Google, Apple, and Amazon.

10.     Many billions of messages are sent between and among Facebook users, each day, taking various forms such as instant messages, timeline posts, and visual stories. Facebook surreptitiously harvest so-called meta-data from each message, building an enormous, and valuable, databank about each user. These databanks are combined, and, with the benefit of massive computing power, Facebook builds predictive models about how Facebook users will respond to various stimuli. Facebook markets this data to third-parties for a profit.

11.     Facebook reported gross revenue of $55.8 billion in 2018.

**Facebook Faces Questions About Use of Its Data In The 2016 Presidential Election**

12.     During the course of the 2016 presidential election, Facebook sold data surreptitiously gathered from users to an entity known as Cambridge Analytica. Upon information and belief, that data was then used by Russian intelligence operatives to attempt to influence American voters.

13.     When Facebook's role in gathering and supplying this secretly obtained data became known to the public at large, Facebook faced enormous public pressure to take greater steps to assure privacy and to take a more socially responsible approach to managing content published on its platform and in using the data it harvests.

**Facebook Attempts To Placate Critics By Censoring Speech**

14.     To assuage an angry public and ultimately to protect its own financial interests, Facebook announced plans to create and enforce so-called "community standards" for content published on its site. These standards are directed toward speech that Facebook regards as inimical to a "safe environment."

15.     Among the content that Facebook finds "objectionable" is bullying and harassment. Facebook does not provide a definition for what bullying or harassment is. However, it does provide a broad definition that may cover almost anything: "Bullying and harassment

3

happen in many places and come in may different forms, from making threats to releasing personally identifiable information, to sending threatening messages, and making unwanted malicious contact."

16.    Facebook further elaborates this so-called standard as follows: "We distinguish between public and private individuals because we want to allow discussion, which often includes critical commentary of people who are featured in the news or who have a large public audience. For public figures, we remove attacks that are severe as well as certain attacks where the public figure is directly tagged in the post of comment."

17.    The standard is hopelessly vague. As Facebook itself notes, "[c]ontext and intent matter, and we allow people to share and reshare posts if its clear that something was shared in order to condemn or draw attention to bullying and harassment."

18.    Facebook reserves the right to remove the "offensive" posts without notifying the user or giving the user an opportunity to clarify or edit his post. Moreover, Facebook reserves the right either temporarily or permanently to disable an account for violation of its "community standards" policy.

19.    The process of removing user posts is totally opaque. The manner in which postings are flagged as community standards violations is unknown, and the extent to which computer algorithms or humans decide which content is objectionable remains unknown.

**Facebook Censors Nick Catone**

20.    Plaintiff, Nick Catone, is a retired MMA fighter who tragically lost his infant son, Nicholas on May 12, 2017.

21.    Since that tragic day, Plaintiff has used Facebook as a means to keep his son's memory alive through pictures and daily journaling.

22.    Facebook, while allowing the accounts of pedophiles, has inhumanely and unfairly terminated Plaintiff's personal account without warning.

23.    Consequently, Plaintiff has lost all of his memories and pictures he had of his son on Plaintiff's Facebook page.

24.     Plaintiff, Nick Catone MMA & Fitness, has used Facebook as the main way to grow and advertise the fitness center. In 2019, Plaintiff spent $15,564.17 in advertising. Plaintiff is currently spending $1800-2000 per month in advertising with Facebook.

25.     Plaintiff purchased a 32,000 square foot building for his fitness center in 2018 and Facebook has been a huge part of his financial growth. Plaintiff needs Facebook to showcase his fitness center. Plaintiff regularly posts pictures and videos of members of the fitness center training in the unique way that makes the fitness center a unique training experience for all.

26.     Like many of his fellow citizens, the Plaintiff, Nick Catone is a thinker who, regardless of whether he is right or wrong, loves to share his thoughts and hear the thoughts of others. He regularly posts on Facebook about his deceased infant son and that vaccines contributed to the death of his son, seeking to engage in debate with the community of friends whose respect he has gained.

27.     The Plaintiff, Nick Catone, used Facebook for open discussion regarding the safety and effectiveness of vaccines.  Plaintiff felt that should be and open discussion to debating the merits of this serious public question.

28.     On February 24, 2020, Facebook censored Plaintiff and removed his posts and Plaintiff without a reason, notification or warning and blocked him from accessing his accounts.

29.     As of the filing of this complaint, Nick Catone has not received a single communication from Facebook as to why his posts have been removed.

30.     Facebook's censorship of Nick Catone embodies its categorical attempt to pander to the pharmaceutical industry. Facebook has elected to apply its vague "community standards" policies in a politically-motivated, ideologically-driven way, silencing pro-health speech that threatens to disrupt the carefully crafted narrative that vaccines are "safe and effective."

31.     The decision to censor Nick Catone and the many other concerned citizens who sought to discuss their vaccine injured children as profound matters of public concern happening in the present moment was undertaken in bad faith.

32.     As a direct and proximate result of the acts and omissions of the Defendants, Nick Catone has suffered ascertainable loss in that he has been deprived access to express his views in a public forum.

33.     As a direct and proximate result of the acts and omissions of the Defendants, Plaintiff can no longer operate his business. Plaintiff cannot check messages, reply to posts or access his business page. The censorship of Plaintiff threatens his livelihood as he invests $30,000 per month to run his business and has no access to run his business as he runs it through Facebook. There is no number he can call or other recourse in order to reinstate his account.

34.     If Facebook does not immediately reinstate Plaintiff's account and access to this account, Plaintiff stands to lose an unconscionable amount of money and may lose his business that he has invested millions of dollars in.

35.     Upon information and belief, Mr. Zuckerberg harbors political ambitions beyond his role as principal of Facebook. His decision to categorically censor the speech of concerned citizens including that of Nick Catone is intentional and is inspired by ill-will, malice, and a desire to deflect attention from himself and Facebook's practice of surreptitiously mining data for profit from consumers who believe they are receiving a free service devoted primarily to their welfare.

## Communications Decency Act

36.     Paragraphs 1 through 35 are incorporated by reference herein.

37.      Facebook is a provider of an "interactive computer service" within the meaning of the Communications Decency Act (CDA) of 1996, 47 U.S.C. Section 230, et seq.

38.     The Communications Decency Act provides immunity from civil liability for materials published on interactive computer service sites. The provision of immunity was intended to avoid "content-based" chilling of freedom of speech in the "new and burgeoning Internet medium." Section 230 was enacted, in part, to preserve the robust nature of speech on the Internet. These principles were clearly articulated in **Zeran v. America Online**, Inc., 129 F.3d 327 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998).

39.     Facebook enjoys immunity from suit under Section 230 of the CDA as a Congressionally mandated means of ensuring free and robust speech on the Internet.

This privileged status necessarily entails a corresponding responsibility to achieve the very goal for which Congress granted the immunity: to wit, the preservation of free speech on a quintessential public forum.

40.     Facebook's enjoyment of immunity from civil liability for the material it transmits on the Internet transforms its editorial decision-making process into management of a constructive public trust.

41 .    The activities of this constructive public trust require that Facebook operate and manage its content-based decisions in accord with the purposes of the trust.

42.     The manner and means by which the defendants have banned the Plaintiff from engaging in free speech on Facebook are a violation of the CDA and constitute a willful and wanton violation of the terms of the constructive public trust.

43.     The defendants use and enjoyment of the immunity conferred by the CDA while simultaneously flouting the very purposes for which Congress conferred immunity is unconscionable and is akin to their secret harvesting of user data for sale at a profit to third parties.

**First Amendment.**

44.      Paragraphs 1 through 43 are incorporated by reference herein. This claim arises under 42 U.S.C. Section 1983.

45.     Facebook's dominant position in control of access to the Internet gives it a quasi-monopolistic power over a quintessential public forum.

46.     Facebook actively seeks to expand the reach of this quasi-monopolistic power and hires teams of social psychologists to study how users interact with site, constructing complex algorithms and engaging in sophisticated behavioral modeling so as to maximize the amount of time each user spends on the site.

47.     By increasing the amount of time users spend on the site, Facebook acquires more data, and is better able to predict how users will behave in response to stimuli. This data and the

associated predictive models are at the core of the Facebook's business plan and are the primary product Facebook sells to advertisers.

48.     The CDA's grant of immunity is integral to the government's purpose of promoting freedom of speech on the Internet. As such, the symbiosis between Facebook and the United States government transforms Facebook's action into state action under the doctrine enunciated in **Burton v. Wilmington Parking Authority,** 365 U.S. 715 (1961).

49.     Facebook's symbiotic relationship with the government is further illustrated by Facebook's policy of complying with subpoenas from law-enforcement agencies, but not with subpoenas from private attorneys, even in criminal cases.

50.     The defendants' decision to ban the Plaintiff from Facebook is an impermissible content-based abridgement of the plaintiff's right to freedom of speech under the First Amendment.

51.     Facebook's so-called "community standards" policy is overbroad and void for vagueness on its face.

52.     Facebook's application of the "community standards" policy in this case is overly broad.

## Fraud

53.      Paragraphs 1 through 52 are incorporated by reference herein.

54.     The Defendants hold themselves out to the world as fostering a means by which the people of the world can communicate with one another.

55.     The Defendants further represent that they will foster communication without censorship of participants based on the content of the participants' ideas and opinions.

56.     The Defendants offer the service of interconnection free of charge to participants, but secretly harvest data about each participant, including the sites participants visit, how long participants visit each site, and other highly personal information about the participants.

57.    The Defendants analyze and then package the data collected from participants to third parties at enormous profit, without obtaining the informed consent of the participants in any meaningful manner.

58.    The Defendants rely upon a vague "community standards" policy as a thinly veiled marketing device, eliminating content deemed unpopular by political parties, parties, and interest groups to which the Defendants intentionally or implicitly support.

59.     Upon information and belief, the lobbying of political interest groups, the pressure of politicians, and the intense public pressure of offended citizens is a sufficient reason for the Defendants to use their "community standards" policy to censor certain speech.

60.    The Defendants foster reliance on their service by participants so long as the benefits the Defendants receive from surreptitious data-mining is not outweighed by adverse reaction from the aforementioned actors.

61.    The defendants administer their "community standards" policy in a secretive and opaque manner.

62.    By holding themselves out to the world as promoters of free expression while simultaneously engaging in selective censorship of certain speech, the Defendants have engaged in fraud.

63.    The Defendants engaged in fraud to the detriment of the plaintiffs in the following ways:

a. The Defendants encouraged and/or solicited the plaintiffs to use Facebook, which led the Plaintiff to build his primary intellectual friendships on Facebook instead of another platform such as LinkedIn or Twitter;

b. When the Defendants' unscrupulous business practices of data mining user data became the target of public ire, the Defendants sought to remedy their public reputations by categorically censoring speech that offended their critics;

c. Without warning, Facebook censors the speech of millions of Americans including the Plaintiffs, and decides to remove his posts;

d. The Defendants never provided fair notice, an opportunity to be heard, or a review of any kind to the Plaintiff;

9

e. The Defendants' actions were not motivated by any broader concern with public policy, but were instigated by a craven profiteering and marketing strategy which led it to align itself with groups and interests perceived to control a greater market share of the advertising revenue on which it relies.

64.     The Defendants' behavior and its fickle manipulation of its "community standards" policy amounts to little more than a bait and switch tactic to allure the Plaintiff to establish and contribute web traffic on its platform, then mined the data that traffic generated to sell for profit, and then censor the Plaintiff's speech when it does not fit the politically correct narrative that the Defendants must perpetuate.

### **Implied Warranty of Good Faith and Fair Dealing**

65.     Paragraphs 1 through 64 are incorporated by reference herein.

66.     Facebook and the Plaintiff entered into contracts about the terms and conditions under which the Plaintiff would use Facebook's social media services.

67.     The Plaintiff honored the terms and conditions of the contracts.

68.     The Defendants have administered the contracts in an entirely self-serving manner, by changing the terms and conditions of the contracts without notice to the plaintiffs, and by otherwise behaving in an unconscionable manner for purposes of enormous financial gain.

### **Intentional and Malicious Interference with Prospective Economic Advantage**

69.     Paragraphs 1 through 68 are incorporated by reference herein.

70.     Plaintiff had a business relationship with his customers and potential customers through Facebook.

71.     By censoring Plaintiff and removing Plaintiff from Facebook, Defendants interfered with those business relations.

72.     Defendants acted with the sole purpose of harming Plaintiff and used dishonest, unfair and improper means

73.     Plaintiff's relationships with his customers has been damaged.

## Damages

74.     Facebook and Mr. Zuckerberg are contemptuous of public oversight of any kind, and regard substantial fines as a simple cost of doing business.

75.     In April 2019, Facebook set aside a sum of $5 billion to use to pay an anticipated fine by the Federal Trade Commission involving systemic breaches of consumer privacy. Even so, the Defendants forecast significant profits.

76.     The Defendants face investigations for breaches of privacy and other regulatory offenses in the European Union under GDPR laws.

77.     Punitive damages in a sum sufficient to make Facebook accountable are necessary.

Wherefore, the Plaintiff seeks damages as follows:

A. Punitive damages in a sum sufficient to punish and deter Facebook for violating the First Amendment, the Communications Decency Act, for engaging in fraud, unfair or deceptive trade practices, intentional and malicious interference with prospective economic advantage and breaching the implied warranty of fair dealing. Because a sum of $5 billion appears to be insufficient to deter Facebook, the plaintiffs ask the jury for a sum significantly in excess of that amount;

B. Attorneys' fees and the cost of this action arising under 42 U.S.C. Section 1988; and

C. Compensatory damages for violating the Plaintiffs First Amendment rights to free speech.

**JURY CLAIM**

The Plaintiff claims trial by jury.

The Plaintiff

_____
By: James G. Mermigis, Esq.
The Mermigis Law Group, P.C.
85 Cold Spring Road
Syosset, NY 11791
MermigisLaw@GMail.com
Tel: 516-353-0075
Fax: 516-682-0011